```
                    IN THE UNITED STATES DISTRICT COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
   UNITED STATES OF AMERICA,      )   Case No. 3:17-CR-00459-L-1
 3                                )
            Plaintiff,            )
 4                                )   Dallas, Texas
   v.                             )   September 22, 2017
 5                                )   1:00 p.m.
   BYRON KEITH RISER,             )
 6                                )   DETENTION HEARING
            Defendant.           )
 7  _____)

 8                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE PAUL D. STICKNEY,
 9                 UNITED STATES MAGISTRATE JUDGE.

10  APPEARANCES:

11  For the Government:          P.J. Meitl
                                 UNITED STATES ATTORNEY'S OFFICE
12                               1100 Commerce Street, 3rd Floor
                                 Dallas, TX  75242-1699
13                               (214) 659-8600

14  For the Defendant:           Erin Brennan
                                 FEDERAL PUBLIC DEFENDER'S OFFICE
15                               525 Griffin Street, Suite 629
                                 Dallas, TX  75202
16                               (214) 767-2746
   Fax: 214/767-2886
17  Recorded by:                 Lavenia Price
                                 UNITED STATES DISTRICT COURT
18                               1100 Commerce Street, Room 1452
                                 Dallas, TX  75242-1003
19                               (214) 753-2168

20  Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
21                               Shady Shores, TX  76208
                                 (972) 786-3063
22

23

24        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25
```

1          DALLAS, TEXAS - SEPTEMBER 22, 2017 - 1:07 P.M.

2          THE COURT:  The Court calls for a detention hearing

3    the case of United States of America versus Byron Keith Riser.

4          MR. MEITL:  P.J. Meitl for the Government, Your Honor.

5          MS. BRENNAN:  Erin Brennan for Mr. Riser.

6          THE COURT:  This is the time and place set for a

7    detention hearing in this matter.  Is the Government ready to

8    proceed?

9          MR. MEITL:  We are, Your Honor.

10          THE COURT:  Is the Defense ready?

11          MS. BRENNAN:  We are, Your Honor.

12          THE COURT:  The Government may call its first witness.

13          MR. MEITL:  Thank you, Your Honor.  We call Kevin

14    Whitworth.

15          THE COURT:  If you'd raise your right hand.

16       (The witness is sworn.)

17          THE COURT:  Thank you.

18          MR. MEITL:  May I proceed, Judge?

19          THE COURT:  Please.

20          KEVIN WHITWORTH, GOVERNMENT'S WITNESS, SWORN

21                        DIRECT EXAMINATION

22    BY MR. MEITL:

23    Q   Detective, why don't you introduce herself to the Court?

24    A   Yes.  I'm Detective Kevin Wentworth.  W-H-I-T-W-O-R-T-H.

25    Badge No. 7889.  I'm a detective with the Dallas Police

1  Department Narcotics Division and a TFO with the ATF HIDTA.

2  Q    And are you one of the case agents on a case known as

3  United States of America versus Byron Keith Riser?

4  A    Yes, sir.

5  Q    All right.  Let's start back in July of this previous -- of

6  this year.  Did you or other agents attempt to purchase drugs

7  from Mr. Riser?

8  A    Yes, sir.

9  Q    And were you able to do so?

10 A    Yes.

11 Q    What happened on that date?

12 A    Which date, sir, are we --

13 Q    July 13th, the first date when -- well, the first

14 transaction.

15 A    Yes.  Used a DPS confidential informant, which purchased

16 marijuana from Mr. Riser.

17 Q    And so does that mean that Mr. Riser actually handed the

18 marijuana in exchange for the cash?

19 A    Yes.

20 Q    Okay.  Let's move forward to August 3rd.  Now, are you --

21 have you become familiar with the fact that other jurisdictions

22 are also investigating Mr. Riser?

23 A    Yes.

24 Q    And which one in particular?

25 A    Richardson PD.

Whitworth - Direct                          4

1   Q    And did they attempt to purchase drugs from Mr. Riser on an

2   occasion on August 3rd?

3   A    Yes, sir.

4   Q    And what kind of drugs were they buying on that occasion?

5   A    Tar heroin.

6   Q    And did they buy heroin from him?

7   A    Not from him, but they had recorded phone calls with him

8   and negotiated the purchase of it, and a female from the

9   apartment delivered the tar heroin.

10  Q    Is Mr. Riser known by a nickname?

11  A    Yes.

12  Q    What's that?

13  A    Blue.

14  Q    And so on these recorded phone calls, you've seen reports

15  related to these calls?

16  A    Yes, sir.

17  Q    Blue himself is on these calls, making the deals for the

18  heroin?

19  A    Yes, sir.

20  Q    Now, is the Richardson Police Department furthering their

21  investigation into that transaction?

22  A    Yes.

23  Q    What is the suspicion or what is the concern that the

24  Richardson Police Department has with -- in particular with

25  that transaction?

1   A    The -- for an overdose death in their town from tar heroin

2   is from that residence.

3   Q    And Mr. Riser is a suspect in that case in the sense that

4   he sold heroin to the individual who later overdosed?

5   A    Right.

6   Q    Okay.  So we just did July 13th and August 3rd.  Moving

7   forward to August 8th, did you or other agents attempt to buy

8   drugs from Mr. Riser once again on that date?

9   A    Yes, sir.

10   Q    What kind of drugs?

11   A    There was a confidential informant used that purchased

12   crack cocaine and marijuana from the residence from two

13   females.

14   Q    Okay.  Now, you said residence.  What residence are we

15   talking about?

16   A    904 North Marsalis, Apartment A.

17   Q    Have you been to that residence?

18   A    Yes, I have.

19   Q    And is it an apartment or a house?

20   A    It's an apartment.

21   Q    Has Mr. Riser been seen there on one occasion or multiple

22   occasions?

23   A    Multiple occasions.

24   Q    Does he appear to reside there on -- at various times?

25   A    Yes, sir.

Whitworth - Direct                                    6

1  Q    Do other individuals appear to reside there?

2  A    Yes.

3  Q    Do those individuals tend to have a similar occupation or

4  engage in some type of behavior that's similar to each other?

5  A    According to intel, prostitution -- prostitutes.

6  Additional individuals that distribute narcotics.

7  Q    Now, based on your experience as a DPD officer and your

8  observations of this house, does it appear to be a place where

9  prostitutes reside or stay or work?

10 A    Yes.

11 Q    Okay.  Now, on this occasion, the August 8th, you said that

12 drugs were purchased from two females, correct?

13 A    Yes.

14 Q    Based on your investigation in this case, did those

15 individuals happen to be prostitutes?

16 A    Yes.

17 Q    Were they doing it on their own or at the direction of Mr.

18 Riser?

19 A    Upon the direction of Mr. Riser.

20 Q    How do you know that?

21 A    From investigation.

22 Q    Okay.  Now, on August 17th, was there another purchase of

23 drugs from Mr. Riser or people associated with him?

24 A    Yes, sir.

25 Q    And what happened on that date?

1  A    Mr. Riser delivered to a confidential informant marijuana.

2  Q    All right.  Based on these drug sales, did you or other

3  agents attempt to get a search warrant for that address, that

4  Marsalis address?

5  A    I did obtain a search warrant.  Yes, sir.

6  Q    And did you and other agents execute that search warrant?

7  A    Yes, sir, on August 22, 2017.

8  Q    Was Mr. Riser there at that time?

9  A    Yes, he was.

10 Q    Did it appear that he had any items in the house that were

11 his that were not on his person?

12 A    Yes.  He had an identification, I believe a debit card that

13 had his name on it.  When -- he was standing outside in a

14 common area.  And when he was placed and detained, he did say

15 that he resided in that apartment.

16 Q    Okay.  What drugs, if any, were found when agents searched

17 the residence?

18 A    Black tar heroin, marijuana, crack cocaine.

19 Q    Were there other prescription pills found in the address as

20 well?

21 A    Yes, sir.

22 Q    And did the officers find any firearms?

23 A    Yes.  There was a .45-caliber handgun found under the couch

24 close to some of the narcotics.

25 Q    You say close to narcotics.  Were narcotics found near the

1  couch?

2  A    Yes.   In the living room area.

3  Q    Okay.   So, we have multiple drug sales.   We have the search

4  warrant.   Is there other reasons that DPD is interested in Mr.

5  Riser?

6  A    Yes.

7  Q    Briefly tell us what those are.

8  A    There was a murder which occurred back in March of this

9  year in which a female by the name of Lisa Saenz was found dead

10  at -- shot to death in the Trinity River, close proximity to

11  this residence.   The detective in the Homicide Division knew

12  that she resided at this -- at the residence with Mr. Riser at

13  that 904 North Marsalis, Apartment A address.   Through

14  investigative techniques from the Homicide Division, they knew

15  on the night that she was murdered that she was at that

16  apartment, she left the apartment, she was picked up close to

17  the apartment, and then approximately five minutes later, after

18  being forcefully abducted, she was, again, murdered and dumped

19  into the Trinity River, and that the Homicide Division is --

20  again, this is still under investigation, and three individuals

21  were charged with that capital murder yesterday, but with her

22  association with Mr. Blue and other associates that he has,

23  with that murder, an additional murder, her being a state

24  witness, you know, it -- I mean, it's just -- I think it's a

25  continual deal, --

1   Q    Okay.

2   A    -- but everything started from there.

3   Q    Let's slow down.  Now, you said that there was a murder of

4   Ms. Saenz back in March, correct?

5   A    Yes.

6   Q    And she had been staying at the 904 Marsalis, Apartment A,

7   the same place you said Mr. Riser admitted he lived?

8   A    Yes.

9   Q    What was her involvement in a prior case, if any?

10  A    She -- her baby daddy was charged with a murder.  And I'm

11  not sure when that murder happened.  Last name of Trevino.  And

12  she was, the way I understand it with the Homicide Division, a

13  witness on that.  And through interviews with the suspects that

14  are charged with the murder, it was requested by individuals

15  like Mr. -- like the Trevino that was arrested for the murder

16  for her to make contact with witnesses on that murder and -- so

17  they would not show up to the trial.

18  Q    Okay.  So, just so I understand, her role was to assist the

19  defense in convincing witnesses, persuading witnesses not to

20  show up at a murder trial?

21  A    Yes.

22  Q    Was that defendant, Mr. Trevino, ultimately convicted or

23  was he acquitted?

24  A    He was convicted.

25  Q    And do you know, based on anything that happened in the

1    court that day, whether they blamed this individual, Ms. Saenz,

2    for that conviction?

3    A    Yes.   According to Detective Montenegro, something was said

4    to her after the conviction was read out.

5    Q    And was her murder in temporal -- was it near the same time

6    as his conviction?

7    A    Yes.

8    Q    How close in time?

9    A    I'm not sure of what the trial date on that was, but just

10   talking with Detective Montenegro, he had recognized her in the

11   courthouse that day.  And when the murder occurred and she was

12   found on March the 10th -- and I'm assuming he was out at the

13   scene -- he recognized her from being in the courtroom that

14   day.

15   Q    And is -- based on the investigation, is there a connection

16   between Trevino, the individual who was convicted of murder,

17   and Mr. Riser and those at the 904 Marsalis?

18   A    Yes.

19   Q    What is the connection that you know of?

20   A    Well, we know through phone records and stuff that there

21   has been phone calls made between -- between all of them,

22   including Mr. Riser's son, who is a DPD officer.  They got 12

23   phone calls between the main suspect between February and

24   March, between the main suspect and Mr. Riser's son also that

25   -- in between the time of the murder.

1    Q    Mr. Riser has multiple children, one of which is a DPD

2    officer?

3    A    Yes, sir.

4    Q    And one who is a Dallas Sheriff's officer?

5    A    Yes.

6    Q    Is the DPD officer an active officer or is he -- has

7    something happened to his employment?

8    A    I believe right now he is on administrative or restrictive

9    -- administrative leave for a family violence deal.

10   Q    All right.  And is he a subject of that murder

11   investigation as well?

12   A    Yes.

13   Q    As is the son who's with the Dallas Sheriff's Office?

14   A    Yes.

15   Q    All right.  Now, just to be clear, Ms. Saenz, the

16   individual who was murdered, the woman who was murdered, was

17   she also a prostitute, based on the investigation?

18   A    Yes.

19   Q    Was she also someone that was using heroin?

20   A    Yes.

21   Q    Similar -- is that person similar to the two women who your

22   investigation bought drugs from who were working for Mr. Riser?

23   A    Yes.

24   Q    Do you have a concern that Mr. Riser or others, now that

25   he's facing federal time, might want to do harm to another

1    witness?

2    A    Yes.

3    Q    Is there a concern by DPD and Richardson Police Department

4    that Mr. Riser is a danger to the public because he's selling

5    heroin to individuals that's leading to overdoses?

6    A    Yes.

7    Q    And as far as you know, is this the first time Mr. Riser

8    has faced a federal charge?

9    A    As far as I know, yes, sir.

10   Q    Based on your conversations with the prosecutor and others,

11   do you understand Mr. Riser is looking at significant prison

12   time based on this conduct and the overall weight that's

13   attributed to him?

14   A    Yes.

15   Q    Do you have a concern that Mr. Riser might, given his age

16   and what he's looking at, might not appear in court or comply

17   with any conditions that the Court imposes upon him?

18   A    We -- when we issued the federal warrant and we sent our

19   Fugitive Task Force and the Marshals out, they were unable to

20   locate him.

21   Q    Even though -- they were looking for him at that Marsalis

22   address?

23   A    Yes.

24   Q    And they have been unable to find him even using all their

25   means at their disposal?

1    A    Yes.

2            MR. MEITL:  Your Honor, those are all the questions I

3    have.

4            THE COURT:  Thank you.  Cross-examination?

5            MS. BRENNAN:  Yes.

6                        CROSS-EXAMINATION

7    BY MS. BRENNAN:

8    Q    You've stated that other persons live at the Marsalis

9    apartment, too.  Who are those other persons?

10   A    I'm sorry.  It was who else resides --

11   Q    Yeah.  Who else resides there?

12   A    I'm sure different people at different times.  Again, I

13   know that two females sold drugs out of there.

14   Q    And those are the two prostitutes you mentioned?

15   A    Yes, ma'am.

16   Q    Okay.  And did they live there?

17   A    They -- no identification said that that was their address,

18   but I mean, again, one of them, I did arrest on the search

19   warrant.  She was there that day.  And she did have some

20   paperwork from -- like from a child -- a CPS deal or something

21   that was in the bedroom.  So it looked -- it seemed like she

22   resided there, too.

23   Q    Okay.  Was she arrested on the date of the search warrant?

24   A    Yes.  On August 22nd.

25   Q    And was anyone else present when the search warrant was

1  executed?

2  A    Yes, ma'am.

3  Q    Who else was there?

4  A    Do you want names?

5  Q    Please.

6  A    Yes.  Can I -- do you mind if I look at my report?

7  Q    No, that's fine.

8  A    Okay.

9  Q    Sure.

10 A    (Pause.)  Jordie Lewis was confronted in the living room.

11 Veronica Miranda was confronted in the bathroom.  That was it

12 inside the residence.  Mr. Riser was outside.  And I know

13 there's another individual outside.

14 Q    And then which one is the prostitute that you were

15 mentioning?

16 A    Veronica Miranda.

17 Q    Veronica?  Okay.  And did they speak with law enforcement?

18 They were both arrested.

19 A    Yes.  No, yes, I transported Mr. Lewis, Ms. Miranda and Mr.

20 Riser to DPD CAPERS.

21 Q    Okay.  And did they interview -- did they give a statement

22 or -- you said that they are both working at the direction of

23 Mr. Riser.  Did --

24 A    Yeah.  Mr. Riser was Mirandized and he requested an

25 attorney.  Mr. Lewis was interviewed.  It was determined --

1    Q    Oh, that's a Mister?

2    A    Yeah.

3    Q    Okay.

4    A    Yeah.   Jordie Lewis.

5    Q    Okay.

6    A    He was -- his mom is the one that's the property manager

7    there.   And after he interviewed, it seemed like he didn't have

8    any involvement, he was never observed there before, so he was

9    let loose.

10   Q    Oh, okay.

11   A    And then Veronica Miranda was arrested and charged.

12   Q    And did she make a statement?

13   A    Basically, I talked to her for a little bit.   I didn't want

14   to interrupt the homicide investigation with Detective

15   Montenegro, so I spoke with her briefly, and most of her

16   concern was about her children and that, you know, that she did

17   know -- I did acknowledge that she was on video prior to this

18   date, on video selling drugs.   She did acknowledge it, but she

19   didn't make any statements to me.

20   Q    Okay.   So she didn't -- she never told you she was working

21   at the direction of Mr. Riser?

22   A    No, ma'am.

23   Q    All right.   That's just something that you all came up with

24   outside of a statement by her?

25   A    What do you mean?

1   Q    You said that she was -- they -- two prostitutes were

2   working at the direction of Mr. Riser, and so I'm just

3   wondering where did that come from.

4   A    Well, --

5   Q    You said investigative techniques, but --

6   A    Well, are you talking about just like that -- well, we know

7   that they were in there selling drugs, without him.  They were

8   in there selling drugs when he was in there, too.  I mean, on

9   video.  So, I mean, if somebody's not there, you know, and

10  that's his apartment, I'm not saying that, I mean, you know,

11  they could stay there, but --

12  Q    And that's his apartment?  Was it -- did he lease that

13  apartment?  Was he on the lease, or --

14  A    We don't -- we don't check that.  I mean, I just, we know

15  that he was -- that he stayed there.  He'd been interviewed

16  there prior.  He tells us that he stays there --

17  Q    How long did you guys conduct surveillance on that

18  apartment?

19  A    For about -- about two months.

20  Q    Okay.

21  A    Yes, ma'am.

22  Q    Okay.

23  A    And through phone pings, too, that we know that he's in

24  that apartment on a daily basis.

25  Q    All right.  And so as far as Mr. Riser actually selling

1   drugs himself, that would be on two occasions, July 13th and

2   then August -- I missed that date.

3   A    I think -- I believe it was the 17th.  Yes, ma'am.

4   Q    August 17th?

5   A    Yes, ma'am.

6   Q    Okay.  All right.

7   A    And then on the -- August --

8   Q    22nd, he was present when the search warrant was executed?

9   A    Yeah.  The -- also, on the buy on the 13th, I also made

10  contact with Mr. Riser at that apartment, too.

11  Q    Okay.  And on the 13th, he sold marijuana to a CI?

12  A    Yes, ma'am.

13  Q    Is that right?  And then -- and August, same thing, he sold

14  marijuana to a CI?

15  A    Yes, ma'am.

16  Q    Okay.  And --

17  A    And on -- yeah, okay, that's right.

18  Q    All right.  And now getting to the death of Lisa, you said

19  that -- Mr. Meitl asked you how Mr. Riser supplied to Mr.

20  Trevino, and you said that you have phone calls made between

21  all of them?

22  A    Yes, ma'am.

23  Q    And then you said Riser's son and the main suspect, and so

24  the main suspect was Trevino?

25  A    Oh, on the murder?  No.  They're -- they were charged

1   yesterday.  It's a Kilpatrick, two other names.

2   Q    Oh, this was on a different --

3   A    Yeah.  This was a completely separate homicide.

4   Q    Okay.

5   A    There was -- the -- Ms. Saenz, her baby's father was the

6   one that was charged with murder.

7   Q    Okay.

8   A    And convicted.

9   Q    And she was the one who was supposed to help with these --

10  A    Yes.

11  Q    -- witnesses?  Okay.  But so did you have phone calls made

12  between Mr. Riser, or is it just his son and then you're tying

13  that to Mr. Riser?

14  A    No.  I mean, I'm just saying through investigative -- of

15  the Homicide Division, they do all the phone records and stuff,

16  and they know all these phone calls to be -- to have taken

17  place.  And, you know, like --

18  Q    I guess my question is, were there any phone calls from Mr.

19  Riser's phone, then?

20  A    No.  Not that I know of.

21  Q    Okay.

22  A    I can't answer that one.

23  Q    Okay.  And you all know that Lisa Saenz stayed at the

24  apartment.  Is that through surveillance?  Is that through

25  phone records?

1  A   Her mom, I believe, told the detective that where she

2  lived.

3  Q   And when did she pass away?

4  A   On -- I believe they found her on March the 10th.

5  Q   Of 2017?

6  A   Yes, ma'am.

7  Q   And three people were charged in that?

8  A   Yes, ma'am.

9  Q   And are they still -- are they --

10  A   In Dallas County.

11  Q   No.  They were actually charged yesterday, capital murder.

12  A   Oh, okay.  I think I'm getting confused on Lisa Saenz'

13  murder and then there is another murder --

14  A   Yes.

15  Q   -- where she was supposed to testify as a defense witness.

16  Okay.

17  A   No.  No, she -- I don't -- she was just -- she was told --

18  her boyfriend, with her baby daddy, --

19  Q   Uh-huh.

20  A   -- that she -- that was a -- that was a -- that was a prior

21  deal to this, yeah.

22  Q   Right, right, right, right.

23  A   Okay.

24  Q   And that was her baby daddy was charged.  What murder was

25  that?

1  A   I don't know which one.

2  Q   Okay.

3  A   Yeah.

4  Q   All right.  How did you guys come up with she was supposed

5  to be helping defense witnesses, or the defense convince

6  witnesses not to testify?

7  A   That is through interviews, I'm sure, with Detective

8  Montenegro and the suspects.

9  Q   Okay.  All right.  Are you familiar with Mr. Riser's

10  criminal history?

11  A   Yes.  I looked at it the night.  It was very minimal.

12  Q   Okay.  So if I said he has one felony conviction from 1993,

13  does that sound accurate?

14  A   I -- it's -- it'd be a minute, but yeah.  I don't even

15  remember seeing a felony conviction on him when I looked at his

16  criminal history, so --

17  Q   All right.  And so he hasn't been arrested for quite some

18  time?

19  A   Right.

20  Q   You'd agree with that?

21  A   Yes, ma'am.

22  Q   And he's got some pending Dallas County cases.  He's on

23  bond for those right now?

24  A   Yes, ma'am.

25  Q   Are you aware of that?  Okay.  Are you aware of any bond

1   violations he's had or anything like that?

2   A   No, ma'am.

3   Q   All right.  Are you aware of whether not those cases have

4   been indicted?

5   A   I am not sure.  Those are my cases, so I haven't -- I

6   haven't gone to a grand jury on them, so --

7   Q   Okay.  So probably not.  All right.  Thank you.

8           MS. BRENNAN:  Pass the witness.

9           THE WITNESS:  Thank you, ma'am.

10          MR. MEITL:  Nothing else, Your Honor.

11          THE COURT:  Thank you.  You may step down.

12          THE WITNESS:  Thank you.

13      (The witness steps down.)

14          THE COURT:  What other evidence for the Government?

15          MR. MEITL:  Nothing else, Your Honor.

16          THE COURT:  Ms. Brennan?

17          MS. BRENNAN:  Yes, Your Honor.  I will call Harold

18  Riser.

19          THE COURT:  Mr. Riser?  Mr. Riser, if you'd come

20

21  forward.

22          MR. H. RISER:  Yes, sir.

23          THE COURT:  Would you raise your right hand?

24      (The witness is sworn.)

25          THE COURT:  Please be seated.

1          MS. BRENNAN:  Did you already get his name and

2     spelling?  Okay.  Just wanted to make sure.

3                HAROLD RISER, DEFENDANT'S WITNESS, SWORN

4                          DIRECT EXAMINATION

5     BY MS. BRENNAN:

6     Q    Mr. Riser, how do you know Byron Riser?

7     A    He's my son.

8     Q    All right.  And where do you live right now?  What's your

9     address?

10    A    4434 Vandervort Drive, Dallas, Texas.

11    Q    And who do you reside there with?

12    A    My family.  My wife and my family.

13    Q    Your wife and your family?  Okay.  Has your son Byron, has

14    he been living with you?

15    A    Yes.

16    Q    All right.  How long has he lived with you?  I guess it's

17    been off and on?

18    A    Off and on for -- well, since the time of his arrest, he's

19    been with me at my house.  That's where he's been.  I mean, you

20    know, he had -- he's always had his address where he lived, and

21    my address is secondary.

22    Q    Okay.

23    A    So he would always be found at my -- we always know where

24    he is.

25    Q    How long have you lived in that home?

1   A    Ma'am?

2   Q    How long have you lived in that home, the Vandervort?

3   A    About 40 years.

4   Q    Okay.  And has your family lived in Dallas, Texas -- has

5   Byron lived here all his life?

6   A    No.

7   Q    No?  Where else has he lived?

8   A    Marshall, Texas.

9   Q    Okay.  Has he lived anywhere else outside of Texas?

10  A    No.

11  Q    All right.  And he's been living there, you said, since his

12  arrest?

13  A    Right.

14  Q    So, since he's been on bond on his state cases?

15  A    Right.

16  Q    And so then you're aware that he is on bond on those state

17  cases?

18  A    Yes.

19  Q    You're aware of them?

20  A    Yes.

21  Q    Okay.  Is he, if the judge here today is supposed to

22  consider whether or not your son can be released, if the judge

23  were to release him, is he welcome to come back to your home?

24  A    Yes.

25  Q    And would you be willing to act as a third-party custodian

1   for him?  Would you be willing to sign him out on a bond?

2   A    Yes, I would.

3   Q    If the Court wanted you to do that?

4   A    Yes.

5   Q    Are you aware of your son's criminal history?  His prior

6   arrest?  He was arrested in 1993.

7   A    Yes.

8   Q    Are you aware of that?

9   A    Yes, I am.

10  Q    Okay.  And are you aware that he got a sentence of 10

11  years' probation?

12  A    Yes.

13  Q    And did he complete that probation?

14  A    Yes.

15  Q    Are you aware of any arrests since that time?

16  A    Not since then.  That'd be the last time.

17  Q    Aside from this case?

18  A    This case.  Yeah.

19  Q    Okay.  Are you aware of any substance abuse issues that

20  your son has?

21  A    As far as I know, he has any -- he doesn't have any.

22  Q    And that home on Vandervort, is -- are there any firearms

23  there?  Any drugs there at that home?

24  A    No drugs.  No drugs.  And we do have a pistol, I mean, but

25  we can get -- we have a pistol for our protection.

1   Q    Okay.

2   A    So --

3   Q    And the Court -- you may have to get rid of that if he were

4   to reside --

5   A    Right.

6   Q    -- at the home with you.

7   A    Right.

8   Q    You're willing to do that?

9   A    I'll be willing to do that, right.

10  Q    And Byron graduated high school?

11  A    Yes, he did.  South Oak Cliff.

12  Q    South Oak Cliff?  And it looks like he had employment for

13  -- oops, I passed it -- he had employment for about 20 years,

14  is that right, in manufacturing?

15  A    Ma'am?

16  Q    He had -- he has prior employment in manufacturing?

17  A    I'm not understanding you.

18  Q    Do you know about his employment history, --

19  A    Yes.  Yes.

20  Q    -- where he's worked in the past?

21  A    Yes.

22  Q    Where has he worked?

23  A    Tyson Foods.  Americana Foods.  He had always worked until

24  he had that open heart surgery.  And then when he had open

25  heart surgery, he got laid off, you know, and couldn't work at

1   the time.  But he was drawing his unemployment.

2   Q   All right.  And is he not in the best physical health right

3   now?  He has a hernia?  Is that right?

4   A   Yes.

5   Q   And then he has high blood pressure and complications from

6   that surgery?

7   A   Very much so.

8   Q   And is he going to the doctor --

9   A   Yes.

10   Q   -- frequently?

11   A   Yes.

12   Q   All right.  Is there anything that you would want to tell

13   the Court when the Court is deciding whether or not to release

14   him on conditions of release, which is basically a federal

15   bond, that I haven't asked you here today?

16   A   No, but I would like to say something.  I mean, it's

17   bothering me.

18   Q   Okay.

19           THE COURT:  Say it.

20           THE WITNESS:  Can I say it?

21           THE COURT:  I'm happy to hear from you.

22           THE WITNESS:  Yes.  About that murder?

23           MS. BRENNAN:  Yes.

24           THE COURT:  Yes.

25           THE WITNESS:  They found those people that did it.

1   They -- the people that -- Elija, she was Byron -- one of

2   Byron's friends.  But they found who killed her.  Today.

3   That's in the papers today.  And they confessed to it, too.  So

4   that's taken.  I mean, I knew he wouldn't -- wouldn't do

5   nothing like that.  But you know, I hate to see people think

6   that he would even commit a crime or something of that nature.

7           MS. BRENNAN:  Okay.  Thank you.  I'll pass the

8   witness.

9           THE COURT:  Cross-examination?

10          MR. MEITL:  Yes, sir.

11                       CROSS-EXAMINATION

12  BY MR. MEITL:

13  Q   Good afternoon, sir.

14  A   Good afternoon.

15  Q   My name is P.J. Meitl.  I'm the prosecutor.  Now, you said

16  your son lives at a -- at his house.  Where is his house?

17  A   His apartment was on Marsalis and Colorado.

18  Q   Okay.  So, 904 Marsalis, Apartment A, that is his house?

19  His apartment?

20  A   I can tell you on Marsalis and Colorado, but as to an

21  address with a number, I don't know.  I could show you -- I

22  could point it out to you.  But as far as the address, I don't

23  know.

24  Q   I understand.  Thank you, sir.  Now, how long has he lived

25  at that address, if you know?

H. Riser - Cross                          28

1   A    Probably -- it hasn't been that long.  But he lived in the

2   area.  He worked at Oak Farms.  That's why he got over there.

3   But they tore Oak Farms down.  And that's when he had that

4   surgery and went to Tyson.  So he had been there in that area,

5   but I don't know how long he had been in that particular

6   apartment.  But he was in the apartment down the street next

7   door to it.

8   Q    Okay.  Who else lives with him on that Marsalis apartment?

9   A    No one that I know of.

10  Q    Okay.  Do you know why he would have told the probation

11  officer that he's lived with you since 2014 and he did not live

12  at Marsalis?

13  A    I have six kids, and all of my kids got my address and my

14  telephone number.

15  Q    Right.  So just like my mother, she'd always take me back

16  in, but that doesn't mean I live there?

17  A    That's right.  Right.

18  Q    Okay.  Fair enough.  Now, you said you had a pistol in the

19  house, correct?

20  A    Yes.  Yes, it's a -- just a little Derringer 2.  Just for

21  protection.

22  Q    I understand.  How long have you had that?

23  A    Probably about seven, eight years.

24  Q    Did your son Byron know you had that?

25  A    No.

H. Riser - Cross                              29

1  Q    He's never seen that before?

2  A    None of my kids know we have that.

3  Q    Okay.  What guns does your son own?

4  A    I don't know if my son own a gun or not.  I never seen -- I

5  don't know if my son own a gun or not.

6  Q    You never talked about a gun with him?

7  A    No.

8  Q    So if we found a gun at his house, does it seem to you that

9  that would be his gun or someone else's gun?

10 A    I couldn't say.

11 Q    Okay.  Now, you said he previously had jobs but he's not

12 currently working.  Correct?

13 A    Right.

14 Q    When was the last time he worked?

15 A    I would say it's maybe a year or something like that.

16 Q    So how does he support himself?  How does he pay for that

17 apartment?

18 A    He -- first, he was on unemployment.  Unemployment.  And my

19 daughter back there -- well, he -- me and my daughter, the

20 family.

21 Q    The family helps him out?

22 A    Right.

23 Q    Did you know that he sold drugs for a living?

24 A    Did I know that he sold drugs?

25 Q    Yes, sir.

1  A    I was kind of like not really knowing because I didn't ever

2  go over -- no, I -- I didn't really know he did it.  I didn't

3  -- to be truthful about it, I didn't know that he was doing it

4  personally.

5  Q    Did you have a suspicion that he was involved with that

6  kind of stuff?

7  A    Kind of like, yeah.  Yeah.

8  Q    And he's a grown man, so there's not a whole lot you could

9  do to stop it, right?

10  A    Right.

11  Q    Is that right?

12  A    Right.  Well, I didn't know it.

13  Q    Right.

14  A    I didn't know that he was doing it personally.  You know,

15  there's things that happen when you kind of suspect it but you

16  don't know it, but you know something's -- you know.

17  Q    Okay.  And you said your son does not use drugs, so if we

18  found drugs at his house, that must mean he's selling those

19  drugs, right?

20  A    No.  I don't think that's possible.  I don't -- I don't --

21  Q    Well, what's more likely, that he's using drugs or selling

22  drugs?

23          MS. BRENNAN:  Your Honor, I'm going to object because

24  --

25          THE COURT:  Sustained.

1          MS. BRENNAN:  -- there's been -- oh, thank you.

2          THE COURT:  You don't have to answer that, sir.

3          THE WITNESS:  All right.

4    BY MR. MEITL:

5    Q   All right.  Let me ask you just a little bit about this

6    murder.  You said some individuals were charged yesterday; it

7    was in the paper today.  Correct?

8    A   Right.

9    Q   And you understand that those people were charged with the

10   actual murder of this young woman?

11   A   Right.

12   Q   You understand that you might be involved in the murder

13   even if you didn't actually pull the trigger?

14   A   I understand that, right.

15   Q   And you understand that the DPD officer is here today

16   saying that your son is a target of that investigation?

17   A   I heard that.

18   Q   That means that they're still looking at him for that

19   murder.

20   A   That -- but, I mean, he's a person of interest.

21   Q   Fair enough, sir.

22   A   Right.  Okay.

23   Q   Did he explain to you, did your son explain to you how he

24   knew Ms. Saenz and what he knew about the murder?

25   A   He know nothing.  Yes.  We -- I -- I interrogated him on

1   that and he knows nothing about that murder.  Because he would

2   have told me something about it.  But he was very hurt when she

3   was murdered.

4   Q    Because he was close to her?

5   A    Yes.  Yes.

6   Q    Were they in a relationship together?

7   A    I don't know about their relationship, but her and her

8   husband, they got put out of where they were staying, and they

9   was -- they were staying with my -- with Byron for (inaudible).

10  So, yes, I know -- I do know that much.

11  Q    Are you talking about the husband that was convicted of

12  murder?

13  A    Right.  Right.

14  Q    They were staying with your son?

15  A    They were staying -- he wouldn't -- if she didn't -- if he

16  didn't have nowhere to stay, is out on the streets, he took

17  them in for a night, to something.

18  Q    So they --

19         MS. BRENNAN:  Your Honor, I'm going to object to this

20  questioning as being beyond the scope of direct exam.

21         THE COURT:  Yes.  It probably is.  Sustained.

22         MS. BRENNAN:  Thank you.

23         MR. MEITL:  Judge.

24  BY MR. MEITL:

25  Q    Let me just ask you, since you've already said it.  Why did

1   you interrogate your son about the murder?  Why would you ask

2   him those questions?

3   A    Because he was very hurt about it.  And the reason was that

4   you know like when the officers and detectives start asking him

5   about it, I couldn't even visualize why they would even ask him

6   about a murder like that.

7   Q    Did you talk to your grandsons about the murder?

8   A    My grandsons?

9   Q    Yes, sir.

10  A    You mean, did we discuss it?

11  Q    Yes.

12  A    Yes, we did.

13  Q    What did they tell you?

14           MS. BRENNAN:  Same objection.

15           THE WITNESS:  They know that he wouldn't do it.

16           THE COURT:  Sustained.

17           MS. BRENNAN:  Beyond the scope of direct exam.

18           THE COURT:  Mr. Riser, you don't -- you don't have to

19  answer that, sir.

20           THE WITNESS:  Okay.

21           MR. MEITL:  Nothing else, Your Honor.

22           THE COURT:  Thank you.  Other questions?

23           MS. BRENNAN:  No, Your Honor.

24           THE COURT:  All right.  Thank you, Mr. Riser.

25           THE WITNESS:  Thank you.

1          THE COURT:  You're excused.

2      (The witness steps down.)

3          MS. BRENNAN:  Your Honor, I just have one exhibit with

4  -- it's Mr. Riser's bond paperwork on his --

5          THE COURT:  Okay.

6          MS. BRENNAN:  -- three pending cases.  May I approach?

7          THE COURT:  Yes.  Exhibit number?

8          MS. BRENNAN:  A.

9          THE COURT:  Any objection?

10         MR. MEITL:  No objection.

11         THE COURT:  It's admitted.

12     (Defendant's Exhibit A is received into evidence.)

13         MS. BRENNAN:  And then we would just ask the Court to

14  take judicial notice of the Pretrial Services report.

15         THE COURT:  Okay.

16         MS. BRENNAN:  And that would be it, Your Honor.

17         THE COURT:  Thank you.

18         MS. BRENNAN:  Thank you.

19         THE COURT:  Rebuttal evidence?

20         MR. MEITL:  Nothing else, Your Honor.

21         THE COURT:  Argument?

22         MR. MEITL:  Yes, Your Honor.  I'll be brief because I

23  think the Court is more than familiar with it.  The Government

24  is moving for pretrial detention of Mr. Riser because he is a

25  danger to the community.  He's selling heroin.  He's selling

1    cocaine.  He's selling methamphetamine.  He's selling

2    marijuana.  And there's at least one active investigation where

3    that heroin led to the death, an overdose death, or believed to

4    have resulted in an overdose death.  That makes him a danger to

5    the community.   It's a rebuttable presumption case.

6        Of course, in this drug case, we have this -- additional

7    facts related to the murder.  And I understand he's not charged

8    with that, but I believe the Court can consider that as

9    relevant evidence, that the Court can consider whether Mr.

10   Riser poses a danger to the community.  Because in that case,

11   Judge, if -- I don't know if it was clear, the way we presented

12   it -- but the individual who was murdered was a witness to

13   another murder and was living with this Defendant.

14       This Defendant, there's now multiple individuals who are

15   very similar to that murdered individual, female prostitutes,

16   using heroin, who are witnesses to his own crimes.  And the

17   Government is concerned about that.  The Government is

18   concerned about Mr. Riser, concerned about his sons, and

19   concerned about the individuals he's associated with.  And it's

20   not just the Government, Judge.  Even his own father suspected

21   he was involved in selling drugs.  His father was concerned

22   about this murder.  And the family is clearly concerned about

23   this.

24       Mr. Riser then lied to Probation, lied to them about his

25   residence, said he had been living with his parents since 2014.

1   Clearly untrue.  There's no reason for him to lie about that

2   unless he was concerned about why he would be attached to the

3   Marsalis address.  That suggests to me that he's not going to

4   be truthful with the Court.  He's not being truthful with the

5   Court's probation officers.  So if you set conditions, I think

6   that he's going to attempt to evade those conditions.

7       I realize that he doesn't have any criminal history to

8   speak of, but the criminal history that we now know of or his

9   crimes that we now know of are incredibly serious.  He's

10  selling serious drugs and he's somehow involved in the murder

11  of a witness to another murder.  And so, for those reasons,

12  Judge, we think he should be detained and no condition or

13  combination of conditions would suffice.

14          THE COURT:  Ms. Brennan?

15          MS. BRENNAN:  Thank you.  Your Honor, we would just

16  ask the Court to follow the recommendation in the Pretrial

17  Services report.  And I would just add that there is no

18  evidence of Mr. Riser selling heroin or selling

19  methamphetamine.  They have evidence of him selling marijuana

20  on two occasions, and then they have him tied to an apartment

21  where other people are living, but there is no evidence of him

22  personally making these sales.  Evidence connecting him to the

23  murder I think is not -- I mean, very shaky, at best.

24      So, we would just ask the Court to consider his history and

25  characteristics.  He's been in the Dallas community for 40

1    years.  He can live at his parents' home.  His sister is here,

2    his son's here, his mom and dad are both here, all to show

3    their support.  The Court could place him on electronic

4    monitoring if there was some issue on thinking he's a flight

5    risk, but I highly doubt that, in his physical condition.  And

6    so we would just ask the Court to place him on conditions of

7    release pending his trial.  Thank you.

8            MR. MEITL:  Your Honor, if I may.  In case it wasn't

9    clear, on August 3rd the Richardson Police Department

10   negotiated a heroin purchase --

11           THE COURT:  That's my understanding.

12           MR. MEITL:  -- from Mr. Riser.

13           THE COURT:  Yes.  Thank you.

14           MR. MEITL:  So he was involved in selling heroin.

15           THE COURT:  The Court has heard the evidence here

16   today, has reviewed the Pretrial Service report, and has, of

17   course, considered all the evidence and the testimony.  The

18   Government has filed a motion for detention in this case,

19   alleging a flight risk and a 10-year drug offense, invoking the

20   rebuttable presumption.  The Court does not find that Mr. Riser

21   is a flight risk, I have no reason to believe that he wouldn't

22   show up to court appearances as required, and I think he's

23   rebutted the presumption on the flight risk basis.  But he has

24   not rebutted the presumption that he is a danger to the safety

25   of the community.  I won't even consider the information that

1   was provided to the Court regarding this young woman that was

2   murdered because I think it's just too sketchy for right now

3   for me to consider for purposes of bond.  But the distribution

4   of heroin does make him a danger to the safety of the

5   community.  Drugs and a gun were found in the residence that he

6   lived at.  The Court does find that there are no conditions of

7   release that can be set that would ensure the safety of the

8   community.  I order him detained.

9       What else for the Government?

10          MR. MEITL:  Nothing else, Your Honor.

11          THE COURT:  For the Defense?

12          MS. BRENNAN:  Nothing, Your Honor.

13          THE COURT:  Thank you.  We're adjourned.

14          THE CLERK:  All rise.

15      (Proceedings concluded at 1:45 p.m.)

16                          --oOo--

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the digital sound recording of the proceedings in the above-
22   entitled matter.

23   **/s/ Kathy Rehling**                    **10/16/2017**

24   _____    _____

25   Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

39

1

2                                    INDEX

3    PROCEEDINGS                                                    2

4    WITNESSES

5    Government's Witnesses

6    Kevin Whitworth
     - Direct Examination by Mr. Meitl                              2
7    - Cross-Examination by Ms. Brennan                            13

8    Defendant's Witnesses

9    Harold Riser
     - Direct Examination by Ms. Brennan                           22
10   - Cross-Examination by Mr. Meitl                              27

11   EXHIBITS

12   Defendant's Exhibits                          Identified Received

13   A     Bond Paperwork                              34        34

14   RULINGS                                                     37

15   END OF PROCEEDINGS                                          38

16   INDEX                                                       39

17

18

19

20

21

22

23

24

25